UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| POLY-AMERICA, L.P., <br><br> Plaintiff, <br><br> v. <br><br> API INDUSTRIES, INC., <br><br> Defendant. | CIVIL ACTION <br><br> Case No.: 1:21-cv-08195-JSR |
| API INDUSTRIES, INC., <br><br> Counterclaim-Plaintiff, <br><br> v. <br><br> POLY-AMERICA, L.P., <br><br> Counterclaim-Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR ATTORNEY'S FEE**

KOFFSKY SCHWALB LLC
Efrem Schwalb
Tal S. Benschar Decl.
500 Seventh Avenue, 8th Floor
New York, New York 10018
Tel.: 646-553-1590
Fax.: 646-553-1591
*eschwalb@koffskyschwalb.com*
*tbenschar@koffskyschwalb.com*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ iii

INTRODUCTION ................................................................................................................................. 1

BACKGROUND .................................................................................................................................... 3

I. The Trade Dress At Issue ............................................................................................ 3

II. The Supplemental Register ......................................................................................... 4

III. Poly-America's Attempts To Preclude Competitors ................................................... 4

    A. Communications With Home Depot ...................................................................... 4

    B. TTAB Answer ........................................................................................................ 5

    C. Testimony Of Its Officer ........................................................................................ 5

IV. The TTAB Decision .................................................................................................... 5

V. Poly-America Files This Action In The Eastern District of Texas, And It Was Then Transferred To This Court ........................................................................ 6

VI. API's Counterclaims .................................................................................................... 6

VII. Poly-America Denies Then Admits That Its Mark Lacks Secondary Meaning ........... 7

VIII. Poly-America Refuses To Produce Ordered Discovery And Is Sanctioned ................ 7

IX. The Summary Judgment Motion ................................................................................. 8

X. The Consent Judgment ................................................................................................ 8

XI. API Has Incurred Substantial Fees .............................................................................. 8

ARGUMENT .......................................................................................................................................... 8

THE COURT SHOULD GRANT API'S APPLICATION FOR FEES .................................................. 8

I. Legal Standards ........................................................................................................... 8

II. This Case Is Exceptional ............................................................................................. 9

    A. Poly-America's Claimed Mark Required It To Achieve Secondary Meaning ...... 9

    B. Poly-America's Own Marketing Strategy Made It Impossible For It To Ever Achieve Secondary Meaning .................................................................................................................................. 10

    C. Poly-America's Actions In This Court Show Bad Faith ............................................................... 11

    D. The *Octane Fitness* Factors Point To Finding This Case Exceptional .......................................... 12

III.    The Requested Fees Are Reasonable ........................................................................................ 13

CONCLUSION .................................................................................................................................. 15

ii

**TABLE OF AUTHORITIES**

**Cases**

*Audemars Piguet Holding S.A. v. Swiss Watch Intern., Inc.*,
   42 F.Supp.3d 540, 546 (S.D.N.Y. 2014) .................................................................................. 13-14

*Bleecker Charles Co. v. 350 Bleecker St. Apartment Corp.*,
   212 F.Supp.2d 226, 230 (S.D.N.Y. 2002) ..................................................................................... 14

*Christian Louboutin S.A. v. Yves Saint Laurent America Holding, Inc.*,
   696 F.3d 206, 216 (2d Cir. 2012) ............................................................................................. 9, 10

*Contractual Obligation Productions, LLC v. AMC Networks, Inc.*,
   546 F.Supp.2d 120, 129 (S.D.N.Y. 2008) ..................................................................................... 15

*Gagne v. Maher,* 594 F.2d 336, 343-44 (2d Cir. 1979) ........................................................................ 14

*Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 172 (2d Cir. 1998) ................................................................. 13

*Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*,
   65 F.3d 1063, 1070 (2d Cir.1995) ................................................................................................. 10

*New York Times Company v. Central Intelligence Agency*,
   251 F.Supp.3d 710, 715 (S.D.N.Y. 2017) ..................................................................................... 14

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 572 U.S. 545, 554 (2014) ................................. 9

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 2022 WL 1026577, at *2 (S.D.N.Y. 2022) .......................... 14

*Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 162-63 (1995) ................................................ 10

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
   909 F.3d 519, 522 (2d Cir. 2018) ..................................................................................................... 9

*Smart Study Co. v. B+Baby Store,* 540 F.Supp.3d 428, 432 (S.D.N.Y. 2021) ....................................... 9

*Sulzer Mixpac AG v. A&N Trading Co.*, 988 F.3d 174, 178 (2d Cir. 2021) ........................................... 4

*Tessemae's LLC v Atlantis Capital LLC,*
   2019 WL 2635956, at *4 (S.D.N.Y. 2019) ................................................................................... 14

*Tiffany and Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 88 (2d Cir. 2020) ......................................... 5

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 35 (2001) ............................................. 2

*United States Pat. & Trademark Off. v. Booking.com B. V.*, 140 S. Ct. 2298, 2302 (2020) ..................... 4

*Versa Prods. Co. v. Bifold Co. (Mfg.) Ltd.,* 50 F.3d 189, 216 (3d Cir. 1995) .......................................... 11

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205 (2000) ..................................................... 10, 13

**Statutes**

15 U.S.C 1071 ................................................................................................................................ 1, 6

15 U.S.C. 1091 ...................................................................................................................................... 4

15 U.S.C. 1117 ................................................................................................................................. 8-9

**Secondary Sources**

1 *McCarthy on Trademarks and Unfair Competition* § 8:14 (5th ed. 2022) ............................................ 11

Defendant Counterclaim Plaintiff API Industries, Inc. ("API" or "Aluf Plastics") moves for attorney's fees in the action against Plaintiff Counterclaim Defendant Poly-America L.P. ("Poly-America.")

## INTRODUCTION

This is an exceptional case, warranting the imposition of attorney's fees. The parties compete in the manufacture and sale of trash bags. Orange color is in demand for the drawstrings, because its is bright and visually distinctive, allowing the user to easily see and tie the strings. For years, Poly-America has sought to monopolize this color through weak claims of trademark rights in that color. But controlling Supreme Court authority establishes that Poly-America has no such rights in the absence of showing "acquired distinctiveness," also known as "secondary meaning."

Poly-America was apprised of this legal reality in 2010 when the Trademark Office *rejected* its application to register the mark on the Principal Register, and Poly-America had to accept registration on the Supplemental Register. Undeterred, Poly-America used its registration to convince customers, like Home Depot, not to order orange-drawstring bags from its competitors.

So API was forced to file a cancellation proceeding in the Trademark Trial and Appeal Board (TTAB) which went on for almost five years. In 2020, the TTAB cancelled the registration for two powerful reasons: (1) the claimed mark is generic, because Poly-America had contracted to sell its bags under "private labels" of eight different brands (and thus the mark was not even "capable" of achieving secondary meaning), and (2) because the mark is functional.

Poly-America then filed this action for review under 15 U.S.C 1071(b). After the case was transferred to this district, API asserted counterclaims that added two more bases why it should be permitted to use the orange color: (1) the mark had not achieved secondary meaning, and (2) the proposed use would not create a likelihood of confusion. These are reasons that could not have been considered by the TTAB. Thus once the case reached this Court, API had four separate reasons why it should be permitted to use the orange color.

Poly-America then conducted the case in bad faith. In response to a Request for Admission, it denied that its mark had not achieved secondary meaning – even though the evidence in the TTAB was overwhelming that the mark is not even *capable* of achieving that, and certainly had not achieved it in the thirteen years Poly-America has been using its claimed mark. Then, faced with a discovery order by Magistrate Judge Moses, Poly-America amended the response in an attempt to avoid producing the discovery. After the Magistrate Judge sanctioned Poly-America and for a second time ordered the discovery produced, and faced with a motion for summary judgment, Poly-America consented to the entry of a Final Judgment affirming the TTAB decision to cancel its registration. (Dkt. 80).

What must be borne in mind is that for over a decade, Poly-America has attempted to monopolize an in-demand color when the law has been clear from the outset that it has no rights in that. The requirement for secondary meaning was established long before Poly-America began using its claimed mark, and its marketing strategy of selling bags with that color through eight or nine different private-label brands means that the mark will *never* achieve secondary meaning. Simply put, ***Poly-America never had and will never have trademark rights in the color orange.*** Yet, it has managed for a protracted period of time to string out its frivolous claim and squelch competition. That effort culminated in the current civil action in this Court, where, as noted, Poly-America did what it could to extend the inevitable result, a judgment which allows API to manufacture orange-drawstring trash bags and compete with Poly-America.

In determining whether a case is exceptional, the Court may consider the needs of compensation and deterrence. These considerations weigh heavily in favor of awarding fees here. The Supreme Court and Congress have imposed legal restrictions on design trademarks precisely to avoid improper monopolization of designs, which is the province of patent law. "The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S.

23, 35 (2001). API has been forced by Poly-America's intransigence to spend significant sums to stop its improper monopolization. A fee award would help deter others from abusing trademark rights, and compensate API for a portion of its efforts.

## BACKGROUND

### I. The Trade Dress At Issue

Central to this case was Poly-America's claimed trademark, or trade dress. As described in its federal Supplemental Registration No. 4027254,

> The mark consists of the color orange as used on the drawstring portion of the goods. The mark consists of the color orange as applied to the entire surface of the drawstrings. The matter shown in broken lines serves to show positioning of the mark and is not part of the mark.
>
> With orange "claimed as a feature of the mark" for Plastic trash bags, in International Class 16.



(Benschar Decl. Exh. A)

The application was originally filed as one for registration on the Principal Register, but the Trademark Office rejected that because the applied-for mark was not inherently distinctive, and thus could only be registered on the Supplemental Register or with a showing of acquired distinctiveness. (Benschar Decl. Exh. B) Poly-America thereafter amended its application to seek registration on the Supplemental Register. (Benschar Decl. Exh. C)

3

## II. The Supplemental Register

Poly-America's registration (which will now be cancelled) is on the Supplemental Register. The Lanham Act provides that marks which are "capable of distinguishing applicant's goods or services and not registrable on the principal register" may be registered on the Supplemental Register. 15 U.S.C. 1091. "The supplemental register contains other product and service designations, some of which could one day gain eligibility for the principal register. The supplemental register accords more modest benefits" than the Principal Register. *United States Pat. & Trademark Off. v. Booking.com B. V.*, 140 S. Ct. 2298, 2302 (2020). "The supplemental register lists non-mark designations ... that are only 'capable' of someday becoming a 'mark' upon the acquisition of secondary meaning. Thus, registration on the supplemental register does not confer the same benefits as does registration on the principal register; in fact, it does nothing to enlarge the substantive rights of the registrant." *Sulzer Mixpac AG v. A&N Trading Co.*, 988 F.3d 174, 178 (2d Cir. 2021).

## III. Poly-America's Attempts To Preclude Competitors

Despite only having obtained a supplemental registration, Poly-America gave numerous indications that its competitors were precluded from manufacturing orange-drawstring trash bags.

### A. Communications With Home Depot

API's Vice-President of Sales, Mimi Oratz, testified during the TTAB proceeding. (Benschar Decl. Exh. D, 4:25 to 5:2 ). She maintains and manages API's Home Depot account, among others, to which API sells trash bags under both the HDX brand and API's Ultrasac brand. (*Id.* 5:3-22). In or around 2012 or 2013, Oratz had discussions with Home Depot about manufacturing bags for them. Originally, Home Depot wished API to manufacture bags with orange drawstrings. However, Poly-America then communicated its purported rights to Home Depot, and since Poly-America was giving Home Depot "trouble," they determined not to use orange. (*Id.* 24:12 to 27:19).

4

### B. TTAB Answer

In its Answer in the TTAB Cancellation proceeding, it affirmatively stated: "Poly-America admits that Aluf Plastics [i.e., API] and the rest of the trash bag industry is precluded from using orange in connection with the drawstrings of a plastic trash bags on the basis of Poly-America's trademark rights to the same." (Benschar Decl. Exh. E, ¶ 15)  Poly-America admitted that again in its Answer to API's Counterclaims in this Court. (Dkt. 36)

### C. Testimony Of Its Officer

In the course of the TTAB proceeding, API deposed Poly-America under Rule 30(b)(6) through its Vice-President of Sales, Trent Mallory. (Benschar Decl. Exh. F)  He testified: "We don't have a trademark on the color orange in and of itself, correct?  We have it for drawstring trash bags.  And because it's unique to our product, there's no reason that anyone would want to use it other than to trade on the reputation and goodwill of our products, whatever shade [of orange] it is." (*Id.* at 90:4-10).  This is tantamount to charging anyone using the orange-drawstring mark as a bad faith infringer.  *Cf. Tiffany and Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 88 (2d Cir. 2020) (Test for bad faith infringement is "whether the defendant attempted to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products.")

## IV. The TTAB Decision

Because Poly-America had used its supplemental registration to dissuade customers from ordering trash-bags with orange drawstrings from anyone other than itself, API filed a cancellation proceeding in the Trademark Trial and Appeal Board (TTAB) to cancel that supplemental registration. The TTAB's two decisions are attached as Complaint Exhibits 1 and 2, Dkt. 1-1 and 1-2.  The TTAB found two reasons for cancellation.  First, it found the claimed orange-drawstring mark generic, because "it has been marketed under many different marks," and thus "consumers would not perceive the color orange as an indicator of source, they would perceive it as a type of trade dress for the genus

5

trash bag." (Dkt 1-1 at 17)  On reconsideration, the Board clarified this holding as "the color orange as a drawstring on Applicant's [*i.e.*, Poly-America's] bags is so common within the genus of trash bags that consumers would primarily associate it with the genus rather than as indicating a unique source of goods within the genus and, as such, is incapable of source identifying significance." (Dkt. 1-2 at 3)

Second, the TTAB found Poly-America's mark to be functional: "[w]e find that the color orange for trash bag drawstrings serves the utilitarian purpose of making the drawstrings easier to grab due to the high visibility of the orange color. Although other colors may provide visibility, based on this record orange is one of a few superior designs at least with white and black trash bags." (Dkt. 1-1 at 26)  The TTAB adhered to this finding on reconsideration. (Dkt. 1-2 at 7)

### V. Poly-America Files This Action In The Eastern District of Texas, And It Was Then Transferred To This Court

Poly-America originally filed this action in the Eastern District of Texas, seeking *de novo* review of the TTAB decision, under 15 U.S.C. § 1071(b). (Dkt. 1).  On API's motion to dismiss, that Court found that it lacked personal jurisdiction over API, but rather than dismiss it, it transferred the case here.  (*See* Dkt. 30, 31).

### VI. API's Counterclaims

API's Answer (Dkt. 32), of course, sought to uphold the TTAB decision.  Given that this Court has broader jurisdiction under the Lanham Act than the TTAB, API brought counterclaims whose purpose was to obtain "a declaratory judgment under the Trademark Act and the common law that Poly-America has no trademark rights in an orange-colored drawstring for trashbags, and that API is accordingly free to manufacture, sell and distribute such trashbags in U.S. Commerce." (Counterclaims, ¶ 1 Dkt. 32 at 2-3)

API relied on four legal theories as to why it should be permitted to manufacture and sell orange-drawstring trashbags.  The first two are the same reasons as found by the TTAB: the mark is generic and functional. (Dkt. 32, ¶¶ 16-18).  API pleaded two additional reasons: Poly-America's

6

mark lacks secondary meaning, (*Id.* ¶¶ 19-20), and API's intended uses would not create a likelihood of confusion with Poly-America, given the use of house marks on the packaging. (*Id.* ¶¶ 22-25).

### VII. Poly-America Denies Then Admits That Its Mark Lacks Secondary Meaning

API served a request for admission that Poly-America admit that its Orange Drawstring Mark, the mark it registered, has not achieved Secondary Meaning in Commerce. Although initially Poly-America denied that request, it later supplemented (actually amended) its response to admit this fact. (API Request for Admission No. 1 and Definitions 7, 8, and 10, Benschar Decl. Exh. G; Poly-America Initial and Supplemental Responses to Request for Admission No. 1, Benschar Decl. Exh. H and I). In both sets of responses, Poly-America denied that API's proposed uses of the orange-drawstring mark, in conjunction with Home Depot's mark and API's own three marks would not be likely to cause confusion. (*See id.*, Responses to Requests for Admission 2 to 5)

### VIII. Poly-America Refuses To Produce Ordered Discovery And Is Sanctioned

Since Poly-America initially denied that its mark had not achieved secondary meaning, API sought discovery relative to that issue. In a letter-motion dated March 21, 2022 (Dkt. No. 44), API asked the Court to compel Poly-Am to produce, *inter alia*, documents responsive to API's Request for Production (RFP) No. 3, including "(d) records of sales of product which bears the Orange Drawstring Mark." (Id. at 2.) By Order dated March 28, 2022 (Dkt. No. 51), the Court granted the motion in part and directed Poly-Am to produce the requested documents no later than April 11, 2022. (*Id.* at 2).

Poly-America refused to produce these documents, and instead amended its response to the Requests for Admission to now admit that is claimed mark did *not* achieve secondary meaning, and hence it should be relieved from this requirement. This necessitated API to again move the Court, and Magistrate Judge Moses both compelled the production and imposed sanctions. (Dkt. 71 at 4)

IX. **The Summary Judgment Motion**

After Poly-America amended its response to the Request for Admission, API moved for summary judgment on one of its counterclaims, relying principally on the new admission of lack of secondary meaning. (Dkt. 64, 65) The motion was fully briefed but never decided.

X. **The Consent Judgment**

Now faced with a second court order requiring it to produce its sales data, as well as a summary judgment motion, Poly-America caved and sought a settlement of the action. This resulted in a consent judgment being submitted to the Court, which the Court entered on July 5, 2022. (Dkt. 80). After reciting the history of the case, the judgment then states that the parties "now acknowledge and agree that the TTAB's final decision should be affirmed in all aspects;" and that API's counterclaims should be dismissed. (*Id.*) The judgment did not dispose of the issue of costs and attorney's fees, leaving that issue open for this motion.

XI. **API Has Incurred Substantial Fees**

As detailed in the accompanying Declaration of Efrem Schwalb, API has incurred a total of $56,104.82 since Poly-America filed this district court action. This sum does not include the time for which Magistrate Judge Moses imposed sanctions, as to which the parties agreed upon an appropriate amount and which has been paid.

## ARGUMENT

## THE COURT SHOULD GRANT API'S APPLICATION FOR FEES

I. **Legal Standards**

Poly-America sought review of the TTAB decision under the Lanham Act, which provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. 1117(a). API has clearly prevailed in the Agreed Judgment, which affirmed the TTAB decision. The case is also exceptional.

> [A]n "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.

*Smart Study Co. v. B+Baby Store,* 540 F.Supp.3d 428, 432 (S.D.N.Y. 2021) (Rakoff, J.) (*quoting Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 572 U.S. 545, 554 (2014)).[1] "[T]here is no precise rule or formula for determining whether a case is exceptional; rather, the statute calls for the exercise of 'equitable discretion.'" *Id.* In making this determination, "district courts [may] consider a 'nonexclusive' list of 'factors,' including 'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Octane Fitness,* 572 U.S. at 554 n. 6.

## II. This Case Is Exceptional

This case is exceptional for several reasons. The most fundamental is that Poly-America well knew that its claimed mark was not protectible, yet it sought to monopolize the right to manufacture orange-colored drawstrings, and then, after API succeeded in the TTAB, it dragged out the issue even in the face of API's clearly meritorious counterclaims.

### A. Poly-America's Claimed Mark Required It To Achieve Secondary Meaning

The most basic issue Poly-America faced is that its mark was not distinctive. "In order for a trademark to be protectable, the mark must be distinctive." *Christian Louboutin S.A. v. Yves Saint Laurent America Holding, Inc.*, 696 F.3d 206, 216 (2d Cir. 2012). A mark can be distinctive in one of two ways. It may be "inherently distinctive" if "[its] intrinsic nature serves to identify a particular source." *Id.* Even a mark that is not inherently distinctive may nonetheless "acquire" distinctiveness by developing "secondary meaning" in the public mind. *Id.* A mark has acquired "secondary

---

[1] *Octane Fitness* interpreted the Patent Act, which uses nearly identical language as the Lanham Act with respect to an award of attorney's fees. Since that decision, courts have universally applied its holding to Lanham Act cases, and the Second Circuit has so held. *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 522 (2d Cir. 2018).

meaning" when, "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *Id.*

In *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205 (2000) the Supreme Court held that product designs, as a matter of law, can never be "inherently distinctive" and thus secondary meaning must always be shown: "a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning." *Id.* at 216. Likewise, a single color may be protectible as a trademark, but again, only upon a showing of secondary meaning. *Id.* at 211 (*citing Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 162-63 (1995)); *see Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1070 (2d Cir.1995).

Thus, whether viewed as a product-design mark or a color mark, Poly-America's mark could *only* be protected if it first achieved secondary meaning. If Poly-America had any doubt about that, it was put to rest when in 2010 the Trademark Office rejected its application to register the mark for lack of secondary meaning, and Poly-America voluntarily amended its application to seek registration on the Supplemental Register. (Benschar Decl. Exhs. B and C).

Yet, despite, having only obtained a supplemental registration, Poly-America used this registration to prevent competitors, like API, from manufacturing orange-colored drawstrings, necessitating the TTAB cancellation proceeding.

### B. Poly-America's Own Marketing Strategy Made It Impossible For It To Ever Achieve Secondary Meaning

Of course, the mere fact Poly-America had not achieved secondary meaning when it obtained its supplemental registration in 2011 did not necessarily mean it would never have protectible rights; after all the whole purpose of the supplemental registration is to register marks which, while not protectible now, may some day be protectible when they gain secondary meaning. But Poly-America proceeded to market its product under numerous private label brands to which it contracted to manufacture them. The TTAB found, and Poly-America never disputed, that it had sold its orange-drawstring trash bags

10

under *eight* different marks, "including Berkley Jenson, HDX, Kirkland Signature, Styleselections, Meijer, Member's Mar, Up&Up and Great Value." (Dkt. 1-1 at 16). And discovery in this action confirms that it has continued to sell its orange-drawstring trashbags through numerous brands, presumably companies with which it contracts. (*See* Benschar Decl. Exh. J, showing images of orange-drawstring trash bags under nine different marks).

The notion that Poly-America could ever achieve secondary meaning under these circumstances is absurd. As the TTAB aptly observed, "[g]enerally, when a company sells to third parties for re-sale under the third parties' marks rather than under the manufacturers mark, that circumstance cripples any attempt to show that consumers uniquely associate the mark with one source, i.e., the manufacturer." (Dkt. 1-1 at 17). *See Versa Prods. Co. v. Bifold Co. (Mfg.) Ltd.,* 50 F.3d 189, 216 (3d Cir. 1995) ("use of private labeling undermines a claim that a product's appearance denotes its source, because consumers will be less likely to associate the multifariously labeled product with a single source"); 1 *McCarthy on Trademarks and Unfair Competition* § 8:14 (5th ed. 2022) (collecting cases finding no secondary meaning in private labelling situation). Indeed, given that Poly-America has claimed to have used its mark for 13 years, and belatedly admitted that it has not achieved secondary meaning, it is difficult to see how it ever could.

Not surprisingly, the TTAB found that Poly-America's claimed mark was not "capable" of achieving secondary meaning, and cancelled it on that basis, as well as that it is functional.

### C. Poly-America's Actions In This Court Show Bad Faith

Once the parties' dispute reached the district court level, the issues that Poly-America faced broadened. The TTAB could only determine whether to cancel Poly-America's supplemental registration, either because it was functional or because it was not capable of achieving secondary meaning. In the district court, however, API had other bases to assert as to why it should not be prevented from manufacturing orange-drawstring trashbags: (1) whether the claimed mark had already

11

achieved secondary meaning, and (2) whether API's proposed use under its own marks would create a likelihood of confusion. These two additional bases were asserted in API's counterclaims.

API's discovery requests were accordingly focused on the issue of secondary meaning, among others. Poly-America first denied that its mark had not achieved secondary meaning, but then, faced with a Court order to produce information it did not want to produce, belatedly changed its response to admit that very point. API then moved for summary judgment, and, seeing the proverbial handwriting on the wall, Poly-America determined to settle.

Poly-America's actions evidence bad faith. What happened between March 11, 2022, when it denied API's Request for Admission (Benschar Decl. Exh. H) and April 19, 2022, when it admitted it (*Id.* Exh. I)? Did Poly-America suddenly discover some facts that caused it to realize that, after thirteen years of use, it had not achieved secondary meaning?

The answer, of course, is that the change was entirely strategic. Poly-America first hoped to avoid losing by denying the obvious, thereby prolonging the action and increasing API's costs. Only when the Magistrate Judge's discovery order forced its hand did it admit the truth in an attempt to avoid producing discovery. When that effort failed, it caved and settled the case.

### D. The *Octane Fitness* Factors Point To Finding This Case Exceptional

The factors set out in *Octane Fitness* support a finding that this case is exceptional. Poly-America's position was objectively unreasonably. Given the longstanding requirement of secondary meaning and Poly-America's private label marketing, it is clear that, as the TTAB found, Poly-America's claimed mark will never achieve, and is thus not "capable" of achieving, secondary meaning. Certainly, it is pellucidly clear that, as of the time of this civil action, Poly-America had not achieved secondary meaning, which it belatedly admitted.

Poly-America's motivation – to use a very weak claim of trademark rights to monopolize a particular color for trash bag drawstrings – also weighs in favor of finding this case exceptional. Well

before Poly-America began using its mark, the Supreme Court held in *Wal-mart* that a trade dress such as it claims requires a showing of secondary meaning. This was based in part on considerations of competitiveness: "Consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves by a rule of law that facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness." *Wal-mart* 529 U.S. at 213. Yet Poly-America did precisely that by using weak – actually non-existent – trademark rights to exclude API from the market.

Poly-America thus forced API to seek relief, first in a lengthy TTAB proceeding, and then, after that Board found against Poly-America, a civil appeal. API had four different bases to vindicate its rights, any one of which would have sufficed to achieve its goal of allowing it to manufacture the design at issue. Once the dispute reached this Court, it was clear that API would, based upon at least one of the four bases, end up with a judgment achieving its goal. Yet Poly-America engaged in gamesmanship in an attempt to lengthen the proceedings as much as possible. There is a need "in [the] particular circumstances [of this case] to advance considerations of compensation and deterrence."

### III. The Requested Fees Are Reasonable

"The court's normal starting point for calculating reasonable attorneys' fees . . . is the calculation of a so-called 'lodestar' figure, which is arrived at by multiplying the number of hours reasonably expended on the litigation ... by a reasonable hourly rate." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 172 (2d Cir. 1998). Here, the fact that the client has paid all of the invoices for the claimed time (except the most recent) (Schwalb Decl. ¶ 3) weighs heavily in favor of finding them reasonable. "As numerous courts have recognized, negotiation and payment of fees by sophisticated clients are solid evidence of their reasonableness in the market." *Audemars Piguet Holding S.A. v. Swiss Watch Intern., Inc.*, 42 F.Supp.3d 540, 546 (S.D.N.Y. 2014) (*quoting Bleecker Charles Co. v. 350 Bleecker St. Apartment Corp.*, 212 F.Supp.2d 226, 230 (S.D.N.Y. 2002)).

13

The rates for the two lawyers working on the case, $400 per hour, are well in line with what is generally charged in this district for trademark cases. *See, e.g., Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 2022 WL 1026577, at *2 (S.D.N.Y. 2022) (finding rates of $460 and $475 reasonable in a trademark case, and noting that this court has awarded rates as high as $570); *Tessemae's LLC v Atlantis Capital LLC,* 2019 WL 2635956, at *4 (S.D.N.Y. 2019) ("The Court therefore finds that $475 per hour is an appropriate rate for Mr. Piekarski").   And the time billed is eminently reasonable given the tasks that had to be dealt with.

The time sought includes time spent on the fee application itself, or "fees on fees," which are awardable under federal fee shifting statutes. *See Gagne v. Maher,* 594 F.2d 336, 343-44 (2d Cir. 1979); *New York Times Company v. Central Intelligence Agency*, 251 F.Supp.3d 710, 715 (S.D.N.Y. 2017) (Rakoff, J.)

14

## CONCLUSION

"A finding of bad faith [and an award of fees] is warranted when a plaintiff's trademark . . . claim is entirely without merit and was asserted for improper purposes such as harassment or delay." *Contractual Obligation Productions, LLC v. AMC Networks, Inc*., 546 F.Supp.2d 120, 129 (S.D.N.Y. 2008). Poly-America's civil action was the last installment in its decade-long effort to monopolize a claimed mark that it knew was invalid, since the Trademark Office told it so in 2010. Yet Poly-America strung out the proceedings until forced to concede, causing API to expend considerable funds. API should be compensated for its efforts that have benefited not only it but other competitors.

For the foregoing reasons, API's motion for fees should be granted.

KOFFSKY SCHWALB LLC

Dated: July 19, 2022  By: _____
New York, New York  Efrem Schwalb
 Tal S. Benschar
 500 Seventh Avenue, 8th Floor
 New York, New York 10018
 Tel.: 646-553-1590
 Fax.: 646-553-1591
 *eschwalb@koffskyschwalb.com*
 *tbenschar@koffskyschwalb.com*

15